# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## FLORENCE DIVISION

| | | |
|---|---|---|
| Michelle Renee Roberson, | ) | Case No.: 4:09-cv-00491-RBH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **FINDINGS OF FACT,** |
| | ) | **CONCLUSIONS OF LAW,** |
| United States of America, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court following a bench trial held on October 25-26, 2010. Dr. Stephen Boatwright, Dr. Michael McCaffrey, and Dr. David Kee, Jr., testified by way of video deposition. At the Court's request, the parties have submitted proposed findings of fact and conclusions of law. Having considered all of the evidence, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded.

## BACKGROUND

This matter is brought before the Court pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-2680. On February 25, 2009, a Complaint was filed by Plaintiff, alleging that she was injured in a motor vehicle collision with an employee of the United States due to the employee's negligence. On August 18, 2010, Plaintiff filed a "Daubert Motion to Exclude Certain Opinion Testimony of James Selph, MD and John V. Walsh IV, MD" [Docket # 35], on which the Court reserved ruling. Pursuant to Federal Rules of Evidence 104 and 702, Plaintiff moved to exclude any and all testimony and opinions from the Defendant's medical experts, Dr. Walsh and Dr. Selph, to the extent said testimony and opinions relate to the causal relationship between the collision and Plaintiff's injuries. The nature of the collision, including the amount of property damage and the speed of the

vehicles involved in the collision, was just one of the bases for Dr. Walsh's and Dr. Selph's shared opinion that there is no plausible causal relationship between the collision and Plaintiff's subsequent medical problems. Their opinion is supported by various other independent bases that are not attacked in the Plaintiff's Daubert Motion, such as (1) no signs of injury at the scene; (2) no complaints of neck pain on the day of the collision; (3) poor relationship between the time of the collision and Plaintiff's symptoms as well as the location of the symptoms; (4) Plaintiff's pre-existing history; (5) the lack of symptoms of focal weakness in the Emergency Department following the accident; (6) the interval expansion of symptoms following the accident and Plaintiff's complaints; and (7) the degenerative nature of her neck condition. As such, the Court denies Plaintiff's Daubert Motion and finds that Dr. Walsh and Dr. Selph are qualified to give an opinion as to the causality of Plaintiff's medical problems and injuries, and their testimony is sufficiently relevant and reliable to warrant its admission since it has other bases independent of property damage and/or speed.

After hearing the testimony; assessing the credibility of witnesses; and reviewing the exhibits, evidence, and briefs submitted by the parties, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### *Collision*

1. The accident at issue occurred on May 4, 2006, at approximately 10:15 a.m., where Pine Hallow Road intersects Highway 544 in Socastee, South Carolina. Mr. Marshall Craig Sasser ("Mr. Sasser"), who is employed by the Department of Interior, Fish, and Wildlife Service and stationed at Waccamaw National Wildlife Refuge, was driving a 2005 Chevrolet Tahoe ("SUV") and towing a 20 foot War Eagle outboard motor boat ("the boat"). Mr. Sasser was

traveling towards Peach Tree Landing to conduct a bird survey, along with two other individuals, Maria Whitehead and Tim Kallegren. (Transcript "Tr." Sasser, pp. 156-58); (Def. Ex. 4).

2.  On that date, Plaintiff was driving a Buick Sedan heading north on Pine Hollow Road in Socastee, South Carolina. Plaintiff stopped her vehicle behind the boat and SUV being driven by Mr. Sasser. (Tr. Roberson, pp. 14-16).

3.  While at the intersection of Highway 544 and Pine Hallow Road, Mr. Sasser realized that he missed his turn and needed to turn around and go back down Pine Hallow Road. He decided to back up the SUV and the boat in order to perform a U- turn at a point just before where Pine Hallow Road enters Highway 544. (Tr. Sasser, pp. 158-60).

4.  As Mr. Sasser began to move backwards, he heard Plaintiff's car horn twice and then what sounded like a bump or metal scraping. Id. at 162; (Tr. Whitehead, p. 183). Mr. Sasser admitted that he improperly backed the SUV and the boat into Plaintiff's vehicle. (Tr. Sasser, pp. 160-61, 178-79). Mr. Sasser also testified that the boat weighed around 2000 pounds. Id. at 179.

5.  Plaintiff testified that she believed the motor blade from the boat engine was going to come through her windshield and hit her in the face so she attempted to avoid the blade by trying to duck. Her testimony was:

> The boat was backing up really fast, and I'm sure I ducked, because I couldn't figure out what to do with my head. The prop of the motor and blade of the motor was headed toward my windshield . . . . The, the instant thing that I can remember is, I must have tried to duck so that, I kept thinking the prop was going to hit me in the face and go through my windshield. So I feel like I ducked. Something happened with my back. It scrunched down, it gave a very funny feeling that I've never felt before. (Tr. Roberson, pp. 14-15).

3

6. By all accounts, the boat motor came in contact with the hood of Plaintiff's car at approximately a 45 degree angle, as the boat was higher than the hood of the car. See id. at 37. Plaintiff was restrained with a seat belt, and her car received "a jarring motion, but it did not move because [she] had [her] foot on the brakes." Id. at 38. Additionally, Plaintiff's air bag did not deploy. Id. at 39. Based on the photographs, collision report, and testimony of the witnesses, this appeared to be a low impact collision. (Def. Ex. 1 & 2).

7. After the collision, Mr. Sasser jumped out of the SUV to see if Plaintiff was injured. Plaintiff was still seated in her vehicle. Mr. Sasser testified that Plaintiff was visibly shaken and crying (Tr. Sasser, p.178). Mr. Sasser admitted that, at the time, he considered that Plaintiff could have sustained a neck injury due to the collision. Id. at 175. Nonetheless, Plaintiff repeatedly told Mr. Sasser that she was not injured immediately following the collision. (Tr. Roberson, p. 42); (Tr. Sasser, p. 168). Moreover, Plaintiff had no bleeding, cuts, abrasions, bruises, or concussion. (Tr. Roberson, p. 43). Plaintiff refused the offer to have an ambulance take her to the hospital because she did not want to pay for the ambulance ride. Id. at 16-17.

8. Dr. Maria Whitehead, one of the passengers in the SUV, corroborated the events of the collision as testified to by Plaintiff and Mr. Sasser. She described the accident as a low impact collision and testified that there were no apparent injuries at the scene. (Tr. Whitehead, p. 184).

9. There was no damage to the boat or motor. (Tr. Sasser, p. 171). The damage to the hood and front grill of Plaintiff's Buick Sedan was estimated by a body shop to be $1787.52. (Tr. Sasser, pp. 167, 177); (Def. Ex. 2). The Defendant has previously paid to the insurance company Plaintiff's property damage, minus Plaintiff's deductible. (Def. Ex. 2).

10. Mr. Sasser did not appear to contest his responsibility for causing the collision, and the Court finds that Mr. Sasser violated South Carolina's statutory duty to back safely without interfering with other traffic and to be vigilant and watchful, and, therefore, was negligent *per se.* Additionally, Mr. Sasser breached the duties to exercise ordinary care in using the highways and to keep a proper lookout and keep the vehicle under proper control so as to avoid colliding with other vehicles on the highway. Mr. Sasser was solely responsible for causing the collision.

### *Medical Treatment*

11. Plaintiff was seen at South Strand Ambulatory Care Center later that day where she complained of lower and upper back pain. (Tr. Roberson, p. 17). The medical records noted a "moderate amount of tenderness to palpation in the perilumbar and parasacral area as well as the right perithoracic," but reflected that she did not complain of neck pain at that time (Def. Ex. 22, p. 42). The Emergency Room diagnosis was "back pain," likely due to muscle spasms, and no neck or spine x-rays were taken (Def. Ex. 22, pp. 33, 37); (Tr. Roberson, p. 44).

12. Plaintiff felt increased pain in her neck within 24 to 48 hours after the collision. On Monday, May 8, 2006, Plaintiff was seen by a chiropractor, Dr. Zack Causey, for severe neck pain. (Tr. Roberson, p. 18); (Tr. Causey, p. 69). She reported reduced or restricted movement with reading, using the telephone, doing laundry, cooking, combing her hair, and driving a motor vehicle. Additionally, she complained of "severe constant pain in the neck area bilaterally." (Def. Ex. 25, p. 10).

13. Prior to the May 4, 2006, collision, Plaintiff received treatment on a fairly regular basis with her family physician, Dr. Victoria Moshoures. The medical records and testimony reveal that

Plaintiff suffered from numerous medical issues, many of which have been described as "mostly female problems" directed in the abdominal area, such as endometriosis; hysterectomy; chronic hematuria; ovarian cysts; tubal ligation; benign breast cysts; a hernia; and a gall-bladder removal. Plaintiff also suffered a wrist injury in 2001 for which she was seen at the hospital, but she did not suffer any permanent injury. On January 7, 2003, Plaintiff complained that she had been having neck pain for two weeks and received a trigger point injection from Dr. Moshoures. Subsequently, Plaintiff visited Dr. Moshoures for other problems on numerous occasions. However, Plaintiff's testimony and medical records reveal that Plaintiff did not complain of neck pain, and Dr. Moshoures did not treat her for neck pain, at any of Plaintiff's subsequent visits after 2003. (Tr. Roberson, pp. 12-13). There is no evidence of Plaintiff having any neck treatment at any time after January 7, 2003, until Plaintiff was injured in May 2006. (Def. Ex. 20).

14. Dr. Causey, the chiropractor, noted in his initial records of May 8, 2006, that Plaintiff had constant severe restricted movement in her cervical region and also noted that Plaintiff felt increased neck pain from looking down, turning her head, coughing and sneezing. (Def. Ex. 25, p. 10). Dr. Causey's testing revealed "gross restrictions in various ranges of motion in her cervical spine" and a minimal loss of range of motion in her lumbar region. (Tr. Causey, pp. 70-71). Dr. Causey testified that Plaintiff had objective evidence of an acute injury, which included muscle spasms in her cervical region and a loss of lordotic curve. Id.; (Def. Ex. 25, p. 11).

15.	Further, Dr. Causey testified that he ordered a MRI of the cervical spine to address Plaintiff's complaints, which he described as cervical radiculopathy and cervical radiculitis, because her neck pain was not responding to his treatment plan. (Tr. Causey, pp. 74-75).

16.	A cervical MRI from InMed Diagnostic Services dated May 22, 2006, noted straightening of the normal cervical lordosis and a moderate left posterior lateral disc bulge at C5-C6, which effaced the ventral thecal sac. Also noted was a moderate diffuse C6-C7 posterior disc bulge, which effaced the ventral thecal sac. (Def. Ex. 24, pp. 6-7).

17.	Dr. Causey's treatments included ice packs, heat therapy, low level laser, electro-stimulation, and chiropractic manipulation therapy. (Tr. Roberson, pp. 19, 52-53). Based on the May 22, 2006 MRI, and due to a lack of progress in Plaintiff's cervical region, Dr. Causey referred Plaintiff to Dr. Stephen Boatwright, a board-certified anesthesiologist and clinical pain management specialist for a medical evaluation. (Tr. Causey, pp. 76-77).

18.	Dr. Causey opined to a reasonable degree of chiropractic certainty that the Plaintiff's neck injury and the treatment that he performed on Plaintiff was directly related to the motor vehicle collision that occurred on May 4, 2006. Id. at 78.

19.	Dr. John Walsh, an orthopedic surgeon specializing in upper extremities, was hired as a medical witness by the Defendant. Dr. Walsh agreed that Plaintiff's neck pain and treatment with Dr. Causey was related to the collision. (Tr. II, Walsh, p. 54).

20.	Plaintiff began treatment with Dr. Boatwright on June 27, 2006. Dr. Boatwright noted that Plaintiff reported that her neck pain was temporarily relieved with chiropractic intervention but the duration of the pain relief with chiropractic treatments had been decreasing. Dr. Boatwright

also noted that in addition to neck pain, Plaintiff had issues with sleep disturbances. (Trial Dep. Boatwright, p. 8).

21. Dr. Boatwright's initial assessment noted significant muscle tension and tenderness on exam with a differential diagnosis of disc bulges and muscle spasms. Dr. Boatwright also testified regarding Plaintiff's objective evidence of acute injury, which included the loss of normal lordotic curve, muscle spasms, and disc bulges at C5-C6 and C6-C7. Id. at 11-12.

22. Dr. Boatwright's initial impression was that Plaintiff had degenerative disc disease, but he did not pursue any treatment for cervical degenerative disc disease. Id. at 38, 45. He also documented myofascial strain and spasm in the left trapezius muscle, which is unrelated to cervical degeneration; Dr. Boatwright's treatment plan targeted this myofascial issue of pain. Id. at 45-46. Further, Dr. Boatwright noted that Plaintiff was having continued "shock-like penetrating pain emanating from her neck into the scapula area". Id. at 16-17.

23. Dr. Boatwright ordered a nerve conduction study ("NCS") of Plaintiff's upper extremities, which was normal. (Def. Ex. 23, pp. 20-23). Dr. Boatwright testified that the NCS results indicated that Plaintiff did not have a cervical neuropathy or radiculopathy at that time. (Trial Dep. Boatwright, pp. 50-51).

24. Dr. Boatwright treated Plaintiff with conservative care for her neck pain and muscle spasms. The treatment included pain medications, therapy, trigger point injections, tens unit, biofreeze treatment, and cervical epidural injections. Id. at 13-21.

25. Plaintiff received consistent ongoing pain-management treatment with Dr. Boatwright through September 26, 2006. Dr. Boatwright stated that Plaintiff had made some progress with the treatments, but that she had plateaued out and was still having complaints in her neck and

shoulder areas. Therefore, he referred Plaintiff to Dr. Michael McCaffrey, a neurologist at Strand Regional Specialty Associates. Id. at 21.

26. Dr. Boatwright testified that his treatment was necessary and medically indicated. He also stated to a reasonable degree of medical certainty that the treatment that he performed on Plaintiff was causally related to the May 4, 2006, collision. Id. at 26-27.

27. Dr. Walsh, the orthopedic witness hired by the Defendant, agreed that he would have advised Plaintiff to have undergone the conservative treatment with Dr. Boatwright. (Tr. II, Walsh, p. 54).

28. Plaintiff was seen by Dr. McCaffrey on October 12, 2006, regarding her neck pain with bilateral shoulder radiation and near fainting spells. (Def. Ex. 21, p. 135). Dr. McCaffrey's notes indicate that Plaintiff had very tense musculature in the posterior neck and sternocleidomastoid bilaterally. Id. at 139. He treated Plaintiff again on November 15, 2006, for neck pain with bilateral shoulder and arm radiation. See id. at 140. The treatment included Botox injections and medications. He eventually gave Plaintiff a diagnosis of cervical dystonia. Id.

29. Dr. McCaffrey treated Plaintiff consistently through January 15, 2010, for her neck pain and migraine headaches, which he attributed to a diagnosis of cervical dystonia. (Trial Dep. McCaffrey, p. 57). He testified that the Botox treatments decreased Plaintiff's neck pain and migraine headaches. Id. at 67. Moreover, Dr. McCaffrey testified that Plaintiff's neck pain and migraine headaches were directly related to the May 4, 2006, collision based on the temporal causal connection and a previous MRI and CT scan of the brain, which was regular. Id. at 57-59.

30.	On August 20, 2007, due to ongoing neck and bilateral shoulder pain, Plaintiff was referred by Dr. McCaffrey to Dr. David Kee, Jr., a neurosurgeon, to see if something surgical could be done to subside Plaintiff's pain. On that date, Dr. Kee noted that Plaintiff had "neck pain radiating to both shoulders currently worse on the left." (Def. Ex. 21, p. 119). Dr. Kee noted that Plaintiff did not "have much in the way of radicular arm pain," but "[p]ain is there all the time" and is "made worse with activities." Id. Dr. Kee further noted that the existing cervical MRI, which was taken earlier that year and appeared to show degenerative disc disease at C5-C6, was grainy. Therefore, he ordered a new cervical MRI and informed Plaintiff that he would review the high-field strength magnet MRI to determine if her C5-C6 disc was pathological. Id. Dr. Kee stated that he scheduled the better quality MRI to determine whether Plaintiff did or did not have a pinched nerve in her neck. (Trial Dep. Kee, p. 14).

31.	On August 23, 2007, the Plaintiff underwent a MRI at Carolina Radiology Associates, L.L.C. and was given a diagnosis of spondylosis of the cervical spine with disc bulges at C5-C6 and C6-C7. (Def. Ex. 20, pp. 231-232); (Def. Ex. 21, pp. 102-103). The impression on the MRI noted that the "[d]isc bulge is more pronounced in the left foraminal location at C5-C6 where there may be contact of the exiting left C6 nerve root. This could be the etiology for a left C6 radiculopathy." Id.

32.	After reviewing the MRI dated August 23, 2007, Dr. Kee testified that it was his belief that the bulging disc was causing pressure on one of the nerves to her left arm, which is an etiology of neck and shoulder pain. (Trial Dep. Kee, p. 15). Dr. Kee made the decision to perform surgery only after reviewing the high-quality MRI and determining that surgery was indicated. Id. at 16.

33. On October 3, 2007, Dr. Kee performed a C5-C6 anterior cervical discectomy with allograft fusion and anterior cervical plating. In his operative note, Dr. Kee noted a soft disk herniation at C5-C6, which extended into the foramen. A 12-mm plate was placed in the prevertabral space and the plate was secured with 14-mm screws. He also testified that the disc was pressing on her nerve. (Def. Ex. 21, pp. 292-293); (Trial Dep. Kee, pp. 16-17).

34. Dr. Kee testified that the soft disk herniation was consistent with some type of acute injury. Specifically, he stated that the soft disk herniation was more consistent with a process that had been present two years or less than with degeneration that had been going on for a number of years. (Trial Dep. Kee, pp. 80-81). The fact that he found minimal bone spurring at the time of surgery also indicated that the disc herniation was a newer problem rather than one that had been there for decades. Id. at 18. Further, Dr. Kee testified that Plaintiff's loss of lordotic curve in the days after the collision was consistent with an acute injury. Id. at 27.

35. In his medical decision making, Dr. Kee stated that "[t]he patient has a history of axial symptoms, which I suspect are coming from her degenerated discs." (Def. Ex.21, p. 119); (Trial Dep. Kee, p. 15). Dr. Kee agreed that Plaintiff's spondylosis, which was diagnosed on the August 23, 2007, MRI, confirmed Plaintiff's degenerative disc disease. (Trial Dep. Kee, pp. 72-73). Dr. Kee further opined that a degenerated disc is more likely to rupture than a non-degenerated disc. Id. at 79.

36. As such, Dr. Kee opined to a reasonable degree of medical certainty that the May 4, 2006, collision was the cause of Plaintiff's disc herniation that he found at the time of surgery, and for which he performed the surgery. Id. at 23, 25-26, 81. He also opined that the herniated disc subsequently caused Plaintiff's radiculopathy and neck pain. Id. at 43, 85-86.

37. The Defendant presented testimony from three expert witnesses, John J. Walsh, IV, M.D., Chair, Department of Orthopaedic Surgery at the University of South Carolina School of Medicine; William L. Brannon, M.D., FAAN FACP, Distinguished Professor Emeritus in Neurology at the University of South Carolina School of Medicine; and James Selph, M.D., Assistant Professor of Clinical Neuropsychiatry, Department of Neurology at the University of South Carolina School of Medicine. (Def. Ex. 8, 10 & 12). All three witnesses shared the same opinion: that the May 4, 2006, accident was a low impact collision and that there is no plausible causal relationship between this minor collision and the injuries that Plaintiff reported. (Tr. II, Walsh, p. 31); (Tr. II, Selph, pp. 75, 84); (Tr. II, Brannon, p. 116); (Def. Ex. 9, 11 & 13). The bases for this opinion was (1) the low impact of the collision; (2) minimal damage to the Buick and none to the boat; (3) no air bag deployment; (4) Plaintiff was restrained and braced herself; (5) no signs of injury at the scene; (6) no complaints of neck pain on the day of the collision; (7) poor relationship between the time of the collision and Plaintiff's subsequent symptoms as well as the location of the symptoms; (8) Plaintiff's pre-existing history; (9) the lack of symptoms of focal weakness in the Emergency Department following the accident; (10) the interval expansion of symptoms following the accident and Plaintiff's complaints; and (11) the degenerative nature of her neck condition. (Def. Ex. 9, 11, & 13); (Tr. II, Walsh, p. 25); (Tr. II, Selph, pp. 75-76).

38. However, Dr. Kee testified that a person can rupture a disc by hitting her head on a kitchen cabinet or even by coughing or sneezing. (Trial Dep. Kee, p. 25). He also stated that the nature of the collision, including the amount of property damage, has no bearing on the causal

relationship to a herniated disc. Id. at 81-82. Even Dr. Walsh agreed that it is possible for a low speed collision to cause a herniated disc. (Tr. II, Walsh, p. 52).

39. The Defendant's medical witnesses also testified that the surgery performed on Plaintiff's cervical spine was not indicated due to the absence of a prior objective finding of radiculopathy. (Tr. II, Walsh, pp. 14, 66); (Tr. II, Selph, pp. 73-74); (Tr. II, Brannon, pp. 116, 120). However, the evidence shows that Dr. Kee did not make the decision to perform the surgery until after he had evaluated Plaintiff and reviewed the August 23, 2007, MRI, which gave the impression of a possible etiology for a C6 radiculopathy (Trial Dep. Kee, pp. 14-16); (Def. Ex. 21, pp. 102-103). Moreover, Dr. Kee's decision to perform the surgery was confirmed by the surgical finding of a soft herniated disc that was pressing on Plaintiff's nerve. (Trial Dep. Kee, p. 16).

40. Plaintiff testified that prior to the surgery she could barely move her neck and any movement would cause tremendous pain. Plaintiff also stated that prior to her surgery she had numbness in her arms and hands. Plaintiff's testimony and the medical records in the months following the surgery indicate that the surgery performed by Dr. Kee was successful in improving Plaintiff's pain symptoms and in increasing the range of motion in her neck. (Def. Ex. 21, pp. 114-117); (Tr. Roberson, p. 26).

41. Dr. Kee testified to a reasonable degree of medical certainty that his treatment was reasonable and necessary given the fact that all previous conservative methods of treatment had failed to remedy Plaintiff's neck pain. (Trial Dep. Kee, p. 22).

42. Dr. Kee testified that he had performed over 2500 cervical surgeries throughout his professional career. Id. at 11. None of the Defendant's medical witnesses were neurological spinal surgeons.

43. Dr. Kee no longer works with Strand Regional Specialty Associates and testified that he will not receive any money from Strand Regional Specialty Associates for his treatment of Plaintiff regardless of the outcome of this case. Id. at 92.

44. The Court finds Dr. Kee very credible. Moreover, the Court believes Dr. Kee is the most capable expert of giving accurate medical opinions because he was able to actually see the condition of the disc during surgery.

45. Based on the testimony, exhibits, and other evidence, the Court finds that the May 4, 2006, collision was the actual and proximate cause of Plaintiff's disk herniation and subsequent radiculopathy, neck pain, and migraine headaches. Additionally, the Court finds that Plaintiff's conservative treatment and care by Dr. Causey, Dr. Boatwright, and Dr. McCaffrey, as well as the surgery performed by Dr. Kee, was reasonable and necessary in an attempt to reduce her onset of neck pain, which proximately flowed from Mr. Sasser's negligence.

### Damages

46. Plaintiff is 44 years old. (Tr. Roberson, p. 8). Pursuant to South Carolina Code section 19-1-150, Plaintiff has a life expectancy of 38.23 years. S.C. Code Ann. § 19-1-150 (2009).

47. Plaintiff has incurred causally-related medical expenses of $91,720.95 (Pl. Ex. 1). Specifically, Plaintiff has incurred the following reasonable and necessary medical and chiropractic expenses as a direct and proximate result of injuries received in the collision:

a.  Grand Strand Regional Medical Center:     $5,194.33
    *5/04/06 – 10/15/07*

| | | |
|---|---|---|
| b. | Carolina Health Specialists:<br>*5/04/06 – 10/15/07* | $742.50 |
| c. | Carolina Radiology Associates<br>*5/04/06 – 10/11/07* | $347.00 |
| d. | Causey Chiropractic:<br>*5/08/06 – 7/13/06* | $2,976.00 |
| e. | InMed Diagnostic:<br>*5/22/06 – 2/19/07* | $2,831.49 |
| f. | FirstChoice:<br>*6/27/06 – 9/26/06* | $5,548.50 |
| g. | EMPI:<br>*8/24/06* | $937.87 |
| h. | Georgetown Hospital Systems:<br>*10/02/06 – 10/20/09* | $27,337.66 |
| I. | Georgetown Radiology Associates:<br>*10/02/06 – 3/03/07* | $1,667.00 |
| j. | Palmetto Internal Medicine:<br>*10/02/06* | $307.00 |
| k. | Myrtle Beach Internists:<br>*10/11/06 – 9/14/09* | $1,979.00 |
| l. | Strand Regional Specialty Associates:<br>*10/12/06 – 1/15/10* | $23,056.60 |
| m. | Georgetown County EMS:<br>*3/03/07* | $450.00 |
| n. | Ocean Ambulatory Surgery Center:<br>*10/03/07* | $16,504.00 |
| o. | Susan Barbieri, MD:<br>*10/03/07* | $1,700.00 |
| p. | Doctors Care:<br>*2/8/08* | $142.00 |

48. The Court finds that Plaintiff has proved by a preponderance of the evidence that she is entitled to $91,720.95 for past medical expenses, which are causally related to the May 4, 2006, collision.

49. According to Dr. Kee, there is also an increased probability that Plaintiff will need a future surgery to her cervical spine due to the fact that her spine is under greater stress because of her fusion surgery. (Trial Dep. Kee, pp. 27-28). However, Plaintiff has failed to prove by a preponderance of the evidence that these medical expenses are reasonably certain to occur.

50.     Plaintiff has dealt with pain and discomfort primarily to her cervical region as a direct result of the May 4, 2006, collision. Additionally, Plaintiff has a permanent injury to her cervical spine. At the time of trial, Plaintiff still suffers from some neck pain and decreased mobility in her cervical region. (Tr. Roberson, pp. 25-27). The Court finds that the Plaintiff has proved by a preponderance of the evidence that she is entitled to damages for past pain and suffering directly resulting from Mr. Sasser's negligence and future pain and suffering reasonably certain to result from her injury.

51.     Plaintiff enjoyed an active lifestyle prior to May 4, 2006, which included horseback-riding, gardening, riding bicycles, and playing ball with her son. (Tr. Tracy Damron, p. 135); (Tr. Chad Damron, p. 145); (Tr. Roberson, p. 27). Plaintiff has suffered a loss of enjoyment of life since the date of the collision, which prevents her from enjoying many of these outdoor activities. (Tr. Roberson, p. 27-28); (Tr. Tracy Damron, p. 135). Additionally, pursuant to the AMA Guidelines of Permanent Impairments, Dr. Kee assigned Plaintiff a whole person impairment rating of 25% to 28%. (Trial Dep. Kee, p. 26); (Def. Ex. 21, p. 118). The Court finds that Plaintiff has proved by a preponderance of the evidence that she is entitled to damages for loss of enjoyment of life.

52.     Plaintiff produced her 2004 to 2008 tax returns showing her gross income as a beautician. (Def. Ex. 7); (Tr. Roberson, pp. 46-47). Plaintiff's gross income for 2004 to 2008 was $2,877; $2,777; $2,729; $2,675; and $3,029, respectively. (Tr. Roberson, pp. 46-47). Plaintiff agreed that she has the ability to work and has maintained her level of functioning. Id. Thus, the Court finds that she is not entitled to compensation for lost wages.

53. As a proximate result of the Defendant's negligence, the Court finds that Plaintiff has suffered injuries and damages and believes that Plaintiff is entitled to compensation for her injuries and damages in the following amounts: **$91,720.95** for past medical expenses; **$ 30,000** for past and future pain and suffering; **$100,000** for loss of enjoyment of life; and **$250** for the property damage deductible, for a total award in the amount of **$221,970.95.** Plaintiff has met her burden of proof entitling her to these damages.

## **CONCLUSIONS OF LAW**

1. Federal Rules of Evidence 104 and 702 as well as relevant case law require a federal court to screen proposed expert evidence to ensure that it is sufficiently reliable and likely to assist the fact finder in order to be admissible at trial. Daubert v. Merrell Dow Pharm., 509 U.S. 579, 592-97 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). The Court concludes that Dr. Walsh's and Dr. Selph's expert opinions of causality are sufficiently reliable and likely to assist the fact finder.

2. The Plaintiff filed a Complaint in this civil action on February 25, 2009, invoking the Court's jurisdiction under 28 U.S.C. § 1346(b) and the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680. The Plaintiff has satisfied the administrative requirements of the Federal Tort Claims Act, and this Court has jurisdiction over this matter. (Def. Ex. 5 & 6). Under the Federal Tort Claims Act, the United States is liable to a claimant to the same extent that a private person would be liable according to the law of the state of the occurrence. 28 U.S.C. § 2674; see Warden v. United States, 861 F.Supp. 400 (E.D.N.C.1993). Accordingly, this Court looks to South Carolina law for a determination of liability against the United States.

3. The United States Department of the Interior, Fish, and Wildlife Service is a governmental

agency of the United States. Mr. Sasser was operating a motor vehicle within the course and

scope of his employment with the United States Department of the Interior, Fish, and Wildlife

Service at the time of the collision on May 4, 2006. <u>See</u> 28 U.S.C. § 2679(b)(1).

4.    To prevail on a negligence claim in South Carolina, a plaintiff must show that the

> (1) defendant owed a duty of care to the plaintiff, (2) defendant breached
> the duty by a negligent act or omission, (3) defendant's breach was the
> actual and proximate cause of the plaintiff's injury, and (4) plaintiff
> suffered injury or damages. <u>Jackson v. Swordfish Invs., L.L.C.,</u> 365 S.C.
> 608, 612, 620 S.E.2d 54, 56 (2005).

5.    A duty is imposed on persons using highways to exercise ordinary care to avoid injuries to

themselves and others. <u>Griffin v. Pitt County Transp. Co.,</u> 242 S.C. 424, 431, 131 S.E.2d 253,

256 (1963); <u>see</u> <u>Epps v. South Carolina State Highway Dep't</u>, 209 S.C. 125, 132-33, 39 S.E.2d

198, 201-02 (1946).

6.    A person operating a motor vehicle on a public highway owes an urgent duty to keep a proper

lookout and keep the vehicle under proper control so as to be able to slow down, stop or turn

such vehicle in order to avoid hazards such as colliding with other vehicles, pedestrians and

obstructions lawfully on the road. <u>See</u> <u>Yaun v. Baldridge</u>, 243 S.C. 414, 419-20, 134 S.E.2d

248, 251-52 (1964); <u>Thomasko v. Poole</u>, 349 S.C. 7, 12, 561 S.E.2d 597, 599 (2002).

7.    South Carolina Code section 56-5-3810 provides limitations on backing a motor vehicle:

> (a) No driver shall back a vehicle unless such movement can be made
> with safety and without interfering with other traffic.

> (b) No driver shall back a vehicle upon any shoulder or roadway of any
> controlled-access highway.

The South Carolina Supreme Court has noted that "the backing of a motor vehicle is attendant

with unusual danger to one who may be in its path and requires commensurate care on the part

18

of the operator of the vehicle." <u>Chesser v. Taylor</u>, 232 S.C. 46, 52, 100 S.E.2d 540, 543 (1957) (citation omitted). Because of this inherent danger, in backing an automobile, a driver has a duty "to be vigilant, watchful and to anticipate and expect the presence of other vehicles upon [the] highway." <u>Green v. Sparks</u>, 232 S.C. 414, 421, 102 S.E.2d 435, 438 (1958).

8. A breach of duty exists when it is foreseeable that one's conduct may likely injure the person to whom the duty is owed. <u>Horne v. Beason,</u> 285 S.C. 518, 521, 331 S.E. 2d 342, 344 (1985).

9. A violation of § 56-5-3810 constitutes negligence *per se.* <u>See</u> <u>Chesser,</u> 232 S.C. at 52, 100 S.E.2d at 543; <u>Green,</u> 232 S.C. at 421, 102 S.E.2d at 439; <u>Scott v. Land Span Motor, Inc.,</u> 781 F. Supp. 1115, 1121 (D.S.C. 1991) (truck driver's act of backing truck on major street during middle of day, despite known blind spot behind truck, violated South Carolina's statutory duty to back without interfering with other traffic and duty to be vigilant and watchful and, therefore, was negligence *per se*). The Court concludes that Mr. Sasser violated South Carolina's statutory duty to back safely without interfering with other traffic and violated the duty to be vigilant and watchful, and, therefore, was negligent *per se.* Additionally, Mr. Sasser breached the duties to exercise ordinary care in using the highways and to keep a proper lookout and keep the vehicle under proper control so as to avoid colliding with other vehicles. The Court concludes that Mr. Sasser was solely responsible for the collision, and no affirmative defense of comparative negligence has been alleged or shown.

10. A plaintiff in a negligence action is entitled to recover all damages proximately resulting from a defendant's negligent acts, including the aggravation of pre-existing conditions. <u>Watson v. Wilkinson Trucking Co.</u>, 244 S.C. 217, 228, 136 S.E.2d 286, 291 (1964). Proximate cause is established by proof of actual and legal causation. <u>Hill v. York County Sheriff's Dep't</u>, 313 S.C.

303, 308, 437 S.E.2d 179, 182 (1993). Actual causation is proved by establishing the injury would not have occurred "but for" the defendant's negligence, while legal causation is proved by establishing foreseeability. <u>Bramlette v. Charter-Medical-Columbia</u>, 302 S.C. 68, 72, 393 S.E.2d 914, 916 (1990). A defendant may be held liable for anything which appears to have been a natural and probable consequence of his negligence. <u>Id.</u> Proximate cause does not mean the sole cause; the defendant's conduct can be a proximate cause if it was at least one of the direct, concurring causes of the injury. <u>Small v. Pioneer Mach., Inc.,</u> 329 S.C. 448, 463, 494 S.E.2d 835, 843 (Ct. App. 1997). The Court concludes that Mr. Sasser's negligence was the proximate cause of Plaintiff's disk herniation, radiculopathy, neck pain, and migraine headaches.

11. An injured party is entitled to recover all damages, present and prospective, which are naturally the proximate consequence of the wrongful act. <u>Smith v. Wells,</u> 258 S.C. 316, 319, 188 S.E.2d 470, 471 (1972). In a personal injury action, a plaintiff can recover for the "necessary and reasonable [medical] expense caused by the injury such as amounts necessarily paid for medicine, medical attendance, hospital expense and care and nursing." <u>Sossamon v. Nationwide Mut. Ins. Co.,</u> 243 S.C. 552, 559, 135 S.E.2d 87, 91 (1964). The Court concludes that Plaintiff's conservative treatment and care by Dr. Causey, Dr. Boatwright, and Dr. McCaffrey, as well as the surgery performed by Dr. Kee, was reasonable and necessary in an attempt to reduce her onset of neck pain and migraine headaches, which proximately flowed from Mr. Sasser's negligence. Further, the Court concludes that Plaintiff has proved by a preponderance of the evidence that she is entitled to $91,720.95 for past medical expenses causally related to the collision.

12. In order to recover for future consequences of an injury, the evidence must establish to a "reasonable certainty" that the future consequences will actually occur. Haltiwanger v. Barr, 258 S.C. 27, 32, 186 S.E.2d 819, 821 (1972); see Pearson v. Bridges, 337 S.C. 524, 524 S.E.2d 108 (Ct. App. 1999). Any award of future medical expenses must be based upon something more than mere speculation. See Kelly v. Brazell, 253 S.C. 564, 567, 172 S.E.2d 304, 306 (1970). In proving future medical expenses, "the value of such care [is] established through expert testimony. Obviously, experts will include medical doctors." 1 Terry E. Richardson, Jr. & Daniel S. Haltiwanger, South Carolina Damages 2-17 (2004) (citations omitted). Dr. Kee testified only that there is an increased probability that Plaintiff will need a future surgery to her cervical spine due to the fact that her spine is under greater stress because of her fusion surgery. As such, the Court concludes that Plaintiff has not met her burden as to future medical expenses, as she has failed to establish that future damages from her injury are reasonably certain to occur.

13. Pain and suffering has long been recognized by South Carolina courts to be a compensable element of damages. See Harper v. Bolton, 239 S.C. 541, 547-48, 124 S.E.2d 54, 57 (1962). "Pain and suffering have no market price. They are not capable of being exactly and accurately determined, and there is no fixed rule or standard whereby damages for them can be measured." Id. The Court "may include such damage for physical pain and suffering as it is reasonably certain will of necessity, result in the future from the injury." Campbell v. Hall, 210 S.C. 423, 430-31, 43 S.E.2d 129, 132 (1947). Similarly, mental pain and suffering is an element of compensatory damages. Shuler v. Heitley, 209 S.C. 198, 202, 39 S.E.2d 360, 361 (1946); see Mims v. Florence Cnty. Ambulance Serv. Comm'n, 296 S.C. 4, 7, 370 S.E.2d 96, 99 (Ct. App.

1988) (damages may be awarded for physical pain and suffering and for mental pain and suffering). The Court concludes that Plaintiff has proved by a preponderance of the evidence that she is entitled to damages for past and future pain and suffering directly resulting from Mr. Sasser's negligence in the amount of $30,000.

14. Loss of enjoyment of life is a separate and distinct element of damages. Boan v. Blackwell, 343 S.C. 498, 501, 541 S.E.2d 242, 244 (2001). "[D]amages for 'loss of enjoyment of life' compensate for the limitations, resulting from the defendant's negligence, on the injured person's ability to participate in and derive pleasure from the normal activities of daily life, or for the individual's inability to pursue his talents, recreational interests, hobbies, or avocations." Id. These damages "compensate the individual not only for the subjective knowledge that one can no longer enjoy all of life's pursuits, but also for the objective loss of the ability to engage in these activities." Id. Based on the evidence, including Dr. Kee's assignment of a whole person impairment rating of 25% to 28%, and the fact that Plaintiff can no longer actively enjoy the outdoor activities she enjoyed prior to the collision, the Court concludes that Plaintiff has proved by a preponderance of the evidence that she is entitled to damages for loss of enjoyment of life in the amount of $100,000.

15. A plaintiff may recover lost wages and loss of future earnings and earning power. Watson v. Wilkinson Trucking Co., 244 S.C. 217, 136 S.E.2d 286 (1964). In this case, Plaintiff's gross income as a beautician for years 2004 to 2008 was $2,877; $2,777; $2,729; $2,675; and $3,029, respectively. This demonstrates that Plaintiff has not lost any past wages, future wages, or earning power as a result of the collision. The Court concludes that Plaintiff is not entitled to compensation for lost wages.

## <u>CONCLUSION</u>

Based on the foregoing, the Court finds and concludes that the United States of America is responsible and liable for the above stated actual damages suffered by Plaintiff. The Court hereby directs the Clerk of Court to enter judgment in favor of Plaintiff against the Defendant in the amount of **$221,970.95**.

**IT IS SO ORDERED.**

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

Florence, South Carolina
November 22, 2010